UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, </br></br> Plaintiff, </br></br> vs. </br></br> MARK PRICE, </br></br> Defendant. | ) </br> ) </br> ) </br> ) </br> ) No. 1:18-cr-0348-JMS-MPB </br> ) </br> ) </br> ) </br> ) |

## **ORDER**

Presently pending before the Court is Defendant Mark Price's Motion to Suppress Evidence. [Filing No. 40.] Mr. Price has been indicted for one count of unlawful possession of ammunition by a convicted felon and two counts of unlawful possession of a firearm by a convicted felon, [Filing No. 43], and the trial in this matter is set for February 18, 2020, [Filing No. 56 at 2]. Mr. Price seeks to suppress evidence obtained after what he contends were unlawful searches and seizures in violation of his Fourth Amendment rights. [Filing No. 40.] The Motion to Suppress is now ripe for the Court's review. For the reasons detailed herein, the Court **DENIES** Mr. Price's Motion to Suppress and his request for a hearing on the matter.[1]

---

[1] Although Mr. Price requested that this matter be set for an evidentiary hearing, [Filing No. 40 at 4], the Court concludes that a hearing is unnecessary because the facts asserted in the parties' briefs regarding the circumstances of the search are not in dispute. *See United States v. Curlin*, 638 F.3d 562, 564 (7th Cir. 2011) (holding that district courts are required to conduct hearings on motions to suppress "only when a substantial claim is presented and there are disputed issues of material fact that will affect the outcome of the motion.").

1

# I.
## BACKGROUND[2]

On October 10, 2018, Mr. Price visited Indy Trading Post, a firearms and ammunition dealer, and placed a special order for a magazine of ammunition, stating that he wanted to use the shooting range once the order came in. [Filing No. 2 at 3.] After viewing Mr. Price's identification, staff at Indy Trading Post conducted an online public records search and discovered that Mr. Price had previous felony convictions. [Filing No. 2 at 3.] The staff then contacted Special Agent Brian Clancy of the federal Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"). [Filing No. 2 at 3.]

On October 16, 2018, Mr. Price returned to Indy Trading Post, accompanied by a female companion. [Filing No. 2 at 3.] He told the staff that he wanted to pick up the magazine that he had ordered and purchase additional .40 caliber ammunition. [Filing No. 2 at 3.] A store clerk showed Mr. Price a box of .40 caliber ammunition, and Mr. Price took possession of the box and opened it to view the live rounds inside. [Filing No. 2 at 3.] Mr. Price then purchased the .40 caliber ammunition and a holster for his female companion and exited the store with the .40 caliber ammunition and the magazine he had ordered. [Filing No. 2 at 3-4.]

The following day, Mr. Price contacted Indy Trading Post and asked about using the firing range, and the staff contacted Agent Clancy to advise that Mr. Price would be returning. [Filing No. 2 at 4.] Later that day, Mr. Price arrived at Indy Trading Post, driving a Ford Escape and accompanied by a female companion. [Filing No. 2 at 4.] Mr. Price stated that he and his companion wanted to use the shooting range and advised that the magazine he had purchased the

---

[2] Because the facts presented in the parties' briefs are not in dispute, the Court will base its recitation of the relevant facts on those included in the Affidavit in Support of the Criminal Complaint, [Filing No. 2].

previous day was not the correct type of magazine that he had intended to order. [Filing No. 2 at 4.] Agent Clancy, who was on the scene in an undercover capacity, arrested Mr. Price for his possession of ammunition the previous day. [Filing No. 2 at 4.]

Agent Clancy then contacted parole officers with the Indiana Department of Corrections, because Mr. Price was on parole for a state conviction for unlawful possession of a firearm by a serious violent felon. [Filing No. 2 at 4.] Under the conditions of his parole, Mr. Price had agreed not to engage in any criminal conduct, not to possess or use drugs, and not to possess any firearms or weapons. [Filing No. 2 at 4-5; Filing No. 42-1 at 1.] He also agreed that he was legally in the custody of the Department of Corrections, that his parole officer could visit him at any reasonable time, and that his "person and residence or property under [his] control may be subject to reasonable search . . . if the [parole] officer or [Department of Corrections] official has reasonable cause to believe that the parolee is violating or is in imminent danger of violating a condition to remaining on parole." [Filing No. 2 at 5; Filing No. 42-1 at 1.]

Three parole officers ("the Parole Officers") arrived at Indy Trading Post to conduct a compliance search of the Ford Escape that Mr. Price had been driving. [Filing No. 2 at 5.] One officer discovered a Smith & Wesson .40 caliber pistol in the center console, at which time he notified Agent Clancy of the firearm. [Filing No. 2 at 5-6.] Agent Clancy then obtained a search warrant for the vehicle, seized the pistol, and discovered a baggie of suspected marijuana located in a Clorox cleaning wipe container in the rear trunk area. [Filing No. 2 at 6.]

Agent Clancy and the Parole Officers then transported Mr. Price to his residence, where the Parole Officers conducted a compliance search. [Filing No. 2 at 6.] In a bedroom believed to be Mr. Price's, the Parole Officers located what they believed to be marijuana roaches and smelled what they believed to be the odor of burnt marijuana in an ash tray next to the bed. [Filing No. 2

at 6.] They also located a box of .40 caliber ammunition in the TV stand and observed mail addressed to Mr. Price. [Filing No. 2 at 6.] The Parole Officers then informed Agent Clancy of what they had found, and Agent Clancy obtained a warrant to search the residence, another vehicle on the property, and an outbuilding. [Filing No. 2 at 6-7.] During the subsequent search, Agent Clancy and the Parole Officers located the following items:

- a "drug note pad" listing prices and amounts;

- a bag to the holster Mr. Price purchased on October 16;

- the ammunition that Mr. Price purchased on October 16 and the receipt from Indy Trading Post;

- $1,038 in cash, including $470 that was hidden in a tin container inside a heating vent and $586 in a small box located on the same TV stand where the ammunition and receipt were found;

- two suspected marijuana roaches;

- a toolbox containing a firearm, firearm box, and assorted ammunition;

- a Ruger Mini 14 rifle; and

- mail addressed to Mr. Price at the address of the residence.

[Filing No. 2 at 7-8.]

## II.
### DISCUSSION

Mr. Price argues that the Parole Officers' searches of his vehicle and residence, as well as ATF's subsequent searches of those areas, were unlawful because the Parole Officers acted as a "stalking horse" for ATF. [Filing No. 41 at 6.] He argues that he had a reasonable expectation of privacy in his residence and in the vehicle, as the doors were locked, and the weapon was not in plain view. [Filing No. 41 at 7-8.] Mr. Price argues that the Parole Officers were merely an

4

investigative tool used by ATF Agents to evade the warrant and probable cause requirements of the Fourth Amendment. [Filing No. 41 at 10-11.]

The Government responds that the search was lawful, first arguing that the stalking horse theory is not widely recognized in law and the proper inquiry is to determine whether the Parole Officers' searches were reasonable under the totality of the circumstances. [Filing No. 42 at 4-6.] According to the Government, the search was reasonable because, after receiving information that Mr. Price had purchased ammunition, the Parole Officers had reasonable cause to believe that Mr. Price was in violation of his parole conditions. [Filing No. 42 at 6.] The Government also argues that, even if the stalking horse theory were applicable, the Parole Officers were acting within their proper authority and not as a stalking horse, because it was within the scope of their official duties to conduct compliance searches after receiving information that created a reasonable suspicion that Mr. Price was violating his parole. [Filing No. 42 at 6-7.] Finally, the Government argues that, even if the searches were improper, the inevitable discovery doctrine applies because: (1) at the time of Mr. Price's arrest, law enforcement had probable cause to believe that he was in possession of firearms and ammunition, and could have obtained a warrant on that basis; and (2) because Mr. Price was arrested, the vehicle would have been inventoried before being towed, and the items inside would have been discovered during the inventory search. [Filing No. 42 at 7.]

A review of the Supreme Court's Fourth Amendment jurisprudence concerning probationers and parolees will be helpful to understanding the parties' arguments and the ultimate result in this case. In *Griffin v. Wisconsin*, the Supreme Court considered whether a probation officer's warrantless search of a probationer's home violated the Fourth Amendment. 483 U.S. 868, 870 (1987). Pursuant to a Wisconsin regulation applying to all probationers, Mr. Griffin was subject to a search condition that allowed any probation officer to search his home without a

5

warrant, as long as there were "reasonable grounds" to believe that contraband was present. *Id*. at 870-71. The Court determined that the regulation satisfied the Fourth Amendment because the state's operation of a probation system presented "special needs" beyond normal law enforcement justifying departure from the usual warrant and probable cause requirements. *Id*. at 873-74. The Court considered that: (1) probationers do not enjoy the same freedoms as ordinary citizens, "permitting a degree of impingement upon privacy that would not be considered constitutional if applied to the public at large;" and (2) warrant or probable cause requirements would prevent probation officers from responding quickly to misconduct and "interven[ing] before a probationer does damage to himself or society," and thereby would reduce the deterrent effect of the probation arrangement. *Id*. at 874-80. The Court concluded that, because the regulation was valid, the search was valid, and it was "unnecessary to consider whether . . . *any* search of a probationer's home by a probation officer is lawful when there are 'reasonable grounds' to believe contraband is present." *Id*. at 880 (emphasis in original).

Following *Griffin*, some courts recognized that, while searches by probation officers are generally valid based on the state's "special needs" underlying the probation system, there is an exception where the probation officer acts as a "stalking horse" for police. *See, e.g.*, *United States v. Watts*, 67 F.3d 790, 793-94 (9th Cir. 1995), *cert. granted, judgment rev'd on other grounds*, 519 U.S. 148 (1997). The Ninth Circuit has explained this so-called "stalking horse theory" as follows:

> A probation officer acts as a stalking horse if he conducts a probation search on prior request of and in concert with law enforcement officers. However, collaboration between a probation officer and police does not in itself render a probation search unlawful. The appropriate inquiry is whether the probation officer used the probation search to help police evade the Fourth Amendment's usual warrant and probable cause requirements or whether the probation officer enlisted the police to assist his own legitimate objectives. A probation officer does not act as a stalking horse if he initiates the search in the performance of his duties as a probation officer.

6

*Id.* at 794. The Seventh Circuit has never addressed this issue.

Then, in *United States v. Knights*, the Supreme Court addressed the question of "whether the Fourth Amendment limits searches pursuant to [a] probation condition to those with a 'probationary' purpose." 534 U.S. 112, 116 (2001). In that case, one of the conditions of Mr. Knights' probation was that he submit to the search of his person, property, and residence at any time, with or without a search warrant or "reasonable cause." *Id.* at 114. After becoming suspicious that Mr. Knights was involved in a string of arsons and vandalism, a detective—who was aware of the search condition—searched Mr. Knights' apartment without a warrant. *Id.* at 115. The Supreme Court rejected Mr. Knights' argument that "a warrantless search of a probationer satisfies the Fourth Amendment only if it is just like the search at issue in *Griffin*—i.e., a 'special needs' search conducted by a probation officer monitoring whether the probationer is complying with probation restrictions"—and instead concluded that the proper inquiry was whether the search was reasonable under the general Fourth Amendment approach of examining the totality of the circumstances, with the search condition constituting "a salient circumstance." *Id.* at 117-118.

As the *Knights* Court explained, the "touchstone of the Fourth Amendment is reasonableness, and the reasonableness of a search is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Id.* at 118-19 (internal quotation marks and citation omitted). The defendant's "status as a probationer subject to a search condition informs both sides of that balance." *Id.* at 119.

Specifically, the Court noted that probation is on the "continuum" of possible criminal punishments and therefore a probation condition may curtail the offender's individual freedoms,

7

just as incarceration does. *Id*. The probation condition requiring that Mr. Knights submit to searches without a warrant or reasonable cause, plus the fact that he was aware of the condition, "significantly diminished [his] reasonable expectation of privacy." *Id*. at 119-120. On the other hand, the Court noted that probationers are more likely to violate the law than ordinary citizens, and the state has an interest in apprehending violators of the law and protecting potential victims. *Id*. at 120-21. Ultimately, the Court held that "the balance of these considerations requires no more than reasonable suspicion to conduct a search of this probationer's house," and summarized its reasoning as follows:

> The degree of individualized suspicion required of a search is a determination of when there is a sufficiently high probability that criminal conduct is occurring to make the intrusion on the individual's privacy interest reasonable. Although the Fourth Amendment ordinarily requires the degree of probability embodied in the term "probable cause," a lesser degree satisfies the Constitution when the balance of governmental and private interests makes such a standard reasonable. . . . When an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable.

*Id*. at 121 (internal citations omitted).

Subsequently, in *Samson v. California*, the Supreme Court addressed "a variation of the question [it] left open in [*Knights*]—whether a condition of release can so diminish or eliminate a released prisoner's reasonable expectation of privacy that a suspicionless search by a law enforcement officer would not offend the Fourth Amendment." 547 U.S. 843, 847 (2006). In that case, Mr. Samson, a parolee, was required to submit to searches without cause, and a police officer who was aware of his parolee status decided to search him based solely on that status, without any other grounds for suspicion. *Id*. at 846-47. First, the Court determined that parolees have even fewer expectations of privacy than probationers, because parole is closer on the "continuum" of punishments to incarceration than probation is. *Id*. at 850. The Court then reviewed California's

8

parole system—which, among other things, required that parolees submit to drug testing, refrain from associating with gang members, meet with parole officers, seek permission before travelling more than 50 miles from home, and refrain from criminal conduct and possession of firearms—and concluded that the "extent and reach of these conditions clearly demonstrate that parolees . . . have severely diminished expectations of privacy by virtue of their status alone." *Id*. at 851-52. Based on these conditions, combined with the search condition, the Court concluded that Mr. Samson did not have *any* reasonable expectation of privacy. *Id*. at 852. However, the state had an "overwhelming interest" in supervising parolees, because they are more likely to commit future criminal offenses, which "warrant[ed] privacy intrusions that would not otherwise be tolerated under the Fourth Amendment." *Id*. at 853.

The Supreme Court has indicated that the "special needs" justification for a search addressed in *Griffin* is separate from the general Fourth Amendment reasonableness inquiry. *See Samson*, 547 U.S. at 852 n.4 ("Nor do we address whether California's parole search condition is justified as a special need under [*Griffin*], because our holding under general Fourth Amendment principles renders such an examination unnecessary."); *Knights*, 534 U.S. at 121 ("Because our holding rests on ordinary Fourth Amendment analysis that considers all the circumstances of a search, there is no basis for examining official purpose."). In light of this distinction, several courts have rejected the stalking horse theory or expressed doubt as to its validity following *Knights* and *Samson*. *See United States v. Ickes*, 922 F.3d 708, 712 (6th Cir. 2019) ("[W]e conclude that the 'stalking horse' caveat, if it survives *Knights* at all, does not apply when a probationer is subject to a valid search provision and law-enforcement officers have a reasonable suspicion that the probationer is engaging in illegal activity."); *United States v. Sweeney*, 891 F.3d 232, 236 (6th Cir.), *cert. denied*, 139 S. Ct. 292 (2018) ("When the government relies on the 'special needs'

9

doctrine to justify a search, the stalking horse exception may still apply, but when the government relies on the totality-of-the-circumstances doctrine as articulated in *Samson*, it does not."); *United States v. Williams*, 417 F.3d 373, 377 (3d Cir. 2005) ("It is clear that the Supreme Court's more recent teaching in *Knights* precludes the viability of "stalking horse" claims in [the probationary search] context. 'Stalking horse' claims are necessarily premised on some notion of impermissible purpose, but *Knights* found that such inquiries into the purpose underlying a probationary search are themselves impermissible."); *United States v. Brown*, 346 F.3d 808, 810 (8th Cir. 2003) ("The government counterargues that [*Knights*] eliminates the stalking horse theory. We agree with the government."); *United States v. Reyes*, 283 F.3d 446, 463 (2d Cir. 2002) (concluding that the stalking horse "doctrine is not a valid defense in this Circuit"); *United States v. Stokes*, 292 F.3d 964, 967 (9th Cir. 2002) (rejecting the argument that "a probation search that was a subterfuge for a criminal investigation violated the Fourth Amendment" because "[t]he Supreme Court put a stop to this line of reasoning" in *Knights*).

Here, under *Knights* and *Samson*, the relevant question is whether the Parole Officers' search of Mr. Price's vehicle and residence were reasonable under the circumstances, balancing the degree to which they intruded upon Mr. Price's privacy against the degree to which they were necessary for the promotion of legitimate governmental interests. *See Knights*, 534 U.S. at 118-19. Mr. Price's expectation of privacy was diminished due to his status as a parolee, given that he was in the legal custody of the state and was subject to various conditions of supervision, including one permitting searches of his property based on less than probable cause. *See Samson*, 547 U.S. at 851-52. Although this expectation was not necessarily diminished to the extent that the defendants' expectations of privacy were in *Samson* and *Knights*—those conditions permitted

10

suspicionless searches, while Mr. Price's condition required "reasonable cause"—it was diminished nonetheless.

Furthermore, as *Samson* recognized, the state has an "overwhelming interest" in supervising parolees like Mr. Price. *See id*. at 853. The interest in favor of the state was stronger here than it was in either *Knights* or *Samson*, because Mr. Price was a parolee whereas Mr. Knights was a probationer, and there were circumstances indicating that Mr. Price had committed a crime whereas the search of Mr. Samson was not supported by any grounds for suspicion. Specifically, the Parole Officers were given information indicating that: (1) Mr. Price had purchased the .40 caliber ammunition and the magazine from Indy Trading Post on October 16, taking both items into his possession when he left; (2) Mr. Price arrived at Indy Trading Post to use the shooting range on October 17; and (3) Mr. Price had been arrested at the shooting range for his prior possession of ammunition. This information undoubtedly created a "sufficiently high probability that criminal conduct [was] occurring to make the intrusion on [Mr. Price's] privacy interest reasonable." *See Knights*, 534 U.S. at 121. Indeed, the Parole Officers knew for certain that Mr. Price had already committed the offense of unlawfully possessing ammunition and he was arrested while on his way to possess and use a firearm at the shooting range. Based on all of these circumstances, it was reasonable for the Parole Officers to search Mr. Price's residence and the property within his control, including the vehicle.

Under this analysis, the stalking horse theory has no application, the Court need not consider whether the search was based on "special needs," and the inquiry ends here. *See Samson*, 547 U.S. at 852 n.4; *Ickes*, 922 F.3d at 712; *Sweeney*, 891 F.3d at 236; *Williams*, 417 F.3d at 377; *Brown*, 346 F.3d at 810; *Stokes*, 292 F.3d at 967. Nevertheless, the Court notes that the Parole Officers, who were responding to information that Mr. Price had committed a crime and was in

11

the custody of federal authorities for doing so, were acting well within their supervisory authority in searching the vehicle and residence. Because they were acting pursuant to their own legitimate objective of determining whether Mr. Price had violated his parole conditions, they cannot be deemed a mere "stalking horse" for law enforcement. *See, e.g.*, *Watts*, 67 F.3d at 794. Furthermore, even if the Parole Officers had not been contacted, and ATF agents conducted the searches themselves, such searches would have been reasonable under the Fourth Amendment for the same reasons that the Parole Officers' searches were reasonable.[3]

### III.
#### CONCLUSION

Based on the foregoing, the searches of Mr. Price's vehicle and residence did not violate the Fourth Amendment. His Motion to Suppress Evidence, [40], is **DENIED**.

Date: 10/18/2019

*[signature]*

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

**Distribution via CM/ECF to all counsel of record**

---

[3] In light of the conclusion that the searches did not violate the Fourth Amendment, it is unnecessary for the Court to address the government's inevitable discovery argument.

